McIlvaine, J.
The Belpre and Cincinnati Railroad Company was chartered, by a special act of the legislature of this state, on 8th day of March, 1845, for the purpose of constructing and maintaining a railroad from a point on the Ohio river opposite Parkersburg, Virginia, or Point Harmar, to some point on the Little Miami Railroad between Plainville, in Hamilton county, and the mouth of Obannon creek, in Clermont county, with power also to locate :and construct branches from its main line to towns and places within the several counties through or into which its main line might be located. Section 11 of this act provides : “ That said corporation may demand and receive from all persons using or traveling upon said road, or for transportation of property, such rates of toll as the corporation may determine, which rates they shall have posted up at each depot.”
The name of this company was afterward changed to "The Marietta and Cincinnati Railroad Company.” The main line of the railroad, now owned and operated by the defendant, was constructed by the corporation thus created, .and under the charter aforesaid.
Afterward, on the 31st of July, 1860, and in pursue,nee of .an act of the General Assembly of Ohio, passed February 24, 1860, entitled “ an act for the relief of the creditors and stockholders of the Marietta and Cincinnati Railroad Company,” the creditors and stockholders of the company organized a new company by the same name, to wit, the defendant; and thereupon such proceedings in law and in fact were had, that all the property, rights, and franchises of the old company, in so far as it was legally competent to do so, were transferred to the defendant. And for the purposes of this case, it is assumed that the defend;ant thereby become a body politic and corporate, and sue *186 ceeded to the right to demand and receive tolls as prescribed in section 11 of the act of March 8, 1845; and that as to the right to demand and receive tolls upon the main line-of' its road, it is subject to no other restriction or limitation than those therein prescribed.
The Scioto and Hocking Yalley Railroad Company was incorporated by a special act of the legislature, passedEebruaiy 20, 1849, for the purpose of constructing and maintaining a railroad from Portsmouth, in Scioto county,, to Newark, in Licking county; and, by the terms of its charter, it was invested with the powers and made subject to the limitations and restrictions contained in section 12 of the act of February 11, 1848, entitled “an act regulating-railroad companies,” which provides, “ that such corporations may demand and receive for the transportation of passengers on said road not exceeding throe and a half cents per mile, and for the transportation of property not exceding five cents per ton per mile, when the same are transported a distance of thirty miles or more; and in case-the same are transported for a less distance than thirty miles, such reasonable rates as may be from time to time fixed by the company,” etc.
Under this charter, the Scioto and Hocking Yalley Railroad Company constructed and put in operation a line of railroad from Hamden, a station on the line of the Marietta- and Cincinnati Railroad, to Portsmouth, a distance of fifty-six miles, intersecting, at Portsmouth, one of the navigable canals of the state.
On the 26th of January, 1864, one J. W. Webb, as receiver and special master, under an order issued from the-Court of Common Pleas of Perry county, Oído, and duly made in an action wherein the Scioto and Hocking Yalley Railroad Company was a party, sold and conveyed to the-defendant the Scioto and Hocking Yalley Railroad between Hamden and Portsmouth, with its equipments and personal property, together with all its franchises, rights, and privileges, except the franchise to be a corporation.. And from that time hitherto the defendant, as a commons *187 carrier of goods and passengers, has owned and operated the Scioto and Ilocking Valley road in connection with its mam line.
Upon this state of facts arises the principal question in this ease, In the management of the road from Hamden to Portsmouth is the defendant entitled to demand and receive tolls at its discretion, as by the terms of the charter under which its main line of road was constructed, or is it subject to the limitations and restrictions contained in the charter of the Scioto and Hocking Valley Company, under which this line of road was built?
The defendant seeks to maintain the affirmative of the former, and the plaintiffs, the affirmative of the latter proposition.
This question is one of legislative intention simply.
In the first place, the defendant claims that under the authority to locate and construct branch roads, as conferred by the charter of the Belpre and Cincinnati Company, it was authorized to purchase the Scioto and Hocking Valley road and operate it as a branch, under the powers and privileges granted by that charter.
In this view we are unable to concur; but, on the contrary, are of opinion that a grant of power to a railroad company to locate and construct branch roads, does not cooler an authority to purchase and operate the railroad of another company constructed under a different charter.
It is also claimed by defendant that, by the act of purchase under any lawful authority, there being no express restrictions as to the use of the purchased road, it became, by operation of law, invested with the same powers and privileges in and about the maintaining and operating of the road from Hamden to Portsmouth, that were conferred upon it' by the Belpre and Cincinnati'charter in the management of its main line, and subject only to the limitations and restrictions therein prescribed.
We are of opinion, however, that the power to demand and receive toll for transportation conferred by the charter granted to the Belpre and Cincinnati Company, has exclusive *188 reference to transportation upon the lines of road therein authorized to be built. Pennsylvania Railroad Co. v. Sly, 65 Penn. St. 205. And that whatever may be the new and additional powers conferred upon the defendant by implication arising from subsequent legislation authorizing it to purchase railroads constructed by other companies,,it can not be said.that the old powers and franchises, specifically conferred by the original charter, were thereby extended, or in anywise enlarged or changed.
The defendants’ authority for making the purchase of the road from Hamden to Portsmouth is found in section 24 of the act of May 1, 1852 (S. & C. 281), which provides: “That any railroad company organized in pursuance of law, may lease or purchase any part or all of 'any railroad constructed by any other company, if such companies’ lines are continuous or connected,” etc. This act is entirely silent as to the terms upon which the purchased road may be maintained and operated by the purchasing company. Indeed, it does not, in terms, authorize the purchasing company to maintain and operate the purchased road at all. But such authority must be implied from the grant of power to purchase, for the reason that the legislature certainly did not intend that the purchased road should cease to be operated as a public highway. And inasmuch as no new mode of use or power of control was expressly provided, and as the power of the purchasing company to demand and receive tolls, as conferred by its own charter, is limited to roads constructed under the charter, it must be inferred that the legislature intended the purchasing company to succeed to the powers and privileges of the vending company, and to none other. And this for several reasons: 1. The intrinsic as well as the market value of such property, as a railroad, largely depends upon the-rates which may be charged for transportation thereon. Now, if the chartered rates follow the property, the contracting parties stand on perfect equality, but if the value, or, in other words, the inducement to contract, depends upon the chartered privileges of the pur *189 chaser, the equality is not preserved, and especially would different companies with different charters occupy unequal grounds as bidders for and purchasers of such property. Again, the right of eminent domain was conferred upon the Scioto and Hocking Valley Company to enable it to-construct this road; and this could not have been done except upon the ground that the road, when constructed, should be a public highway. Thus private property and a. public use were united. But the private interest in the highway was created, with the condition attached that the property should be subservient to the use of the public upon the payment to the company of compensation at the rates specified in the grant. And although we are not, called upon to determine the extent to which this property and its use, m between the public and the defendant, is subject to legislative control, we have no doubt as to the-right of the public to use the road upon the terms secured by the charter so. long as it remains a public highway, unless the legislature shall clearly declare its intention to the contrary. And if it be, that the restrictions imposed by the charter of a railroad company upon its right to demand and receive toll for transportation on its road, is a. limitation upon the right of private property therein, then it is quite clear that by a sale of the road, no greater rights therein can pass to the vendee than were owned by the-vendor.
3. That the legislature did not intend that the purchased road should be operated under the charter of the purchasing-company, may also be inferred from the consequences that otherwise might follow. In the early history of railroads-in this state, a few companies, including the Belpre and Cincinnati, obtained from the legislature irrepealable charters, without any restriction upon the right to fix the rates for transportation. Very soon, however, the evils likely to-result from such legislation were discovered, and a change in the policy of the state took place, as was manifested by the act of February 11, 1848, whereby railroad companies: were limited in the exercise of this power. This restrictive- *190 policy has been continued ever since, unless the granting of power to lease or purchase be an exception. Now if, by purchasing continuous or connecting lines, the purchasing company may extend over the purchased roads the privileges and powers of its own charter, the legislature has opened a way by which all the railroads in the state may pass into the hands of companies having irrepealable privileges, and be operated for all time without restriction as to the price of fare and freight. Such state of things certainly was not contemplated by the legislature.
The next question in the case is, has the defendant, in fixing the tariff of rates sought to be enjoined, exceeded the authority conferred by section 12 of the act of February 11, 1848? The price fixed for the transportation of the plaintiff's’ property from their furnaces to Portsmouth, a distance of twenty-eight miles, is $2.25 per ton, while the maximum price allowed by the statute for thirty miles is $1.50 per ton. When the transportation is for thirty»miles or more, distance is the only element which, under the statute, is allowed to control the maximum charge, and it is to be presumed that the same elerneut was intended to be considered in fixing a reasonable rate or price for a less distance. That distance alone does not control the discretion of the company in fixing the rates for less than thirty miles is clear enough ; but as, by the statute, $1.50 per ton for full thirty miles is the maximum sum that can be charged under any and all circumstances, and as distance is an element that must be considered in fixing reasonable rates for distances less than thirty miles, we can see no way to escape the conclusion that the legislature intended that the maximum price per ton for thirty miles should in no case be exceeded for distances less than thirty miles. In the case of Smith v. Pittsburg, Fort Wayne and Chicago Railway Co., decided at the present term (28 Ohio St. 17), it was held, that whether the rate fixed by the company for distances less than thirty miles was reasonable or not, was a question of fact for the jury, to be determined under such instructions by the court as the circumstances of the ease *191 might require; and it was said, that when the price fixed-for a distance less than thirty miles exceeds the maximum allowed for full thirty miles, it is, as matter of law, unreasonable to the extent of the excess. We must therefore hold, that the tariff of rates fixed by the defendant for the transportation of the plaintiffs’ property from their furnaces to Portsmouth is unauthorized, at least, to the extent of the difference between $2.25 and $1.50 per ton.
It is also claimed by the plaintiffs that the defendant, in fixing its rates for transportation upon that part of the Hamden and Portsmouth road between their furnaces and Portsmouth, have violated the provisions of the act of May 1, 1852 (S. & C. 318), which provides, “that it shall be unlawful for any railroad company-whose line of road extends to any place in the vicinity of, or to a point of intersection with, any of the navigable canals of this state, to charge or receive any higher rate for transporting similar merchandise, produce, or property over a shorter distance of its road than is charged or received, according to its fixed tariff, for the transportation to and from such place of intersection.” The court, however, is of opinion that, upon the facts stated in this record, it is not necessary to determine the true meaning of this provision, or whether the defendant, in the management of the Scioto and Hocking Valley road, is subject to the provisions of this statute. The intent of the statute was not to restrain companies subject to its provisions from charging the maximum rates allowed by their charters, but only to prevent them from fixing rates for longer distances below the maximum and below the rates fixed for shorter distances, either to the prejudice of the canals belonging to the state, or of the public whose shipments might be for the shorter distance. And inasmuch as the tariff of rates fixed by the defendant for longer distances are not below the maximum allowed by law, and below the rates fixed for shorter distances, no question under this statute fairly arises in the case.
Nor is it necessary, in the view we have taken of the case, to consider any question that might otherwise arise, *192 under the act-of April 4, 1863, supplementary to the act of May 1, 1852, entitled “ an act to provide for the creation and regulation of incorporated eompanies in the State of Ohio.”
Demurrer to reply overruled, and cause remanded to the-District Court for further proceedings.